# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### November 1, 2011 Session

## BRUCE ALEXANDER TUCK v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Weakley County**
**No. 2010-CR-99     William B. Acree, Jr., Judge**

———————————

**No.  W2011-00262-CCA-R3-PC  - Filed July 5, 2012**

———————————

The Weakley County Grand Jury indicted the petitioner, Bruce Alexander Tuck, in three separate cases.  In each case, the petitioner was indicted for aggravated rape, especially aggravated kidnapping, and various other related offenses.  The petitioner pled guilty in each case, agreeing to serve three, consecutive twenty-year sentences at 100 percent, resulting in an effective sentence of sixty years.  No direct appeal was filed.  The petitioner filed a petition for post-conviction relief in which he alleged that his guilty pleas were not entered voluntarily, knowingly, and intelligently.  He claims that when he entered his pleas, he was mentally ill and subject to mistreatment and threats in an attempt to induce him to plead guilty.  He also alleges that his trial counsel was ineffective for:  (1) failing to discuss the facts and circumstances underlying each of the indictments charging the petitioner; (2) failing to review the audio and visual recordings of the petitioner's first statement to police; (3) failing to file a motion to suppress the petitioner's confession; and (4) failing to discuss with the petitioner the possibility of withdrawing his pleas.  Following an evidentiary hearing, the post-conviction court concluded that the petitioner did not prove his assertions.  Based upon our review, we conclude that the evidence does not preponderate against the findings of the post-conviction court.  Therefore, we affirm the denial of the petitioner's petition for post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., joined.  JERRY L. SMITH, J., Not Participating.

John M. Miles, Union City, Tennessee, for the appellant, Bruce Alexander Tuck.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; and Thomas A. Thomas, District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL BACKGROUND

On July 23, 2009, the petitioner broke a window in the apartment of M.A.,[1] who was not home at the time, entered the apartment, and stole a television worth more than $500. On July 24, 2009, the petitioner again entered the victim's home. When she arrived home at approximately 9:30 a.m., she encountered the petitioner, who was wearing a mask and latex gloves. He held her at gunpoint, directed her to her bedroom, and bound her with tape. He put on a condom, raped her, and then forced the victim to bathe in order to destroy any evidence that was present on her body. He left her bound in her bedroom.

On August 5, 2009, G.B. was at home alone cooking dinner when she felt the presence of someone behind her. She turned and saw the petitioner wearing a mask and latex gloves. He brandished a firearm, directed the victim to her bedroom, put on a condom, and raped her. When she resisted, the petitioner struck her in the temple, choked her, put the gun to her head, and threatened to kill her if she continued to struggle. He then forced the victim to shower in an attempt to destroy evidence and left her bound in her bedroom.

On August 30, 2009, A.P. was moving into a rental home with the help of her parents. When they entered the home through the front door, the victims noticed that the back sliding glass door had been broken. The petitioner, wearing a mask and latex gloves, then came down the stairs and held the victims at gunpoint. He robbed each victim, taking jewelry and a credit card, and ordered the victims to the bedroom. He forced A.P. to bind her parents and tie them to the bedposts. He then put on a condom and raped A.P., forcing her parents to watch. The victims saw the petitioner dispose of the condom in the toilet. After the victims freed themselves, they called the police who determined that a search of the sewer line was feasible. Workers for the City of Martin, Tennessee, used sewer line cameras to locate what appeared to be the condom, excavated the sewer line, and recovered the condom, which was intact and contained semen.

The petitioner became a suspect in the rapes when a firefighter with the fire department where the petitioner had volunteered contacted the Martin Police Department and reported that the petitioner fit the description of the rapist that the police had given to the public. Officers also learned that the mask used in each of the rapes was the same type of mask used by firefighters and that, as a volunteer firefighter, the petitioner had access to this type of mask.

---

[1] It is the policy of this Court to refer to the victims of sexual assaults by their initials.

The condom recovered from the third rape was sent to the Tennessee Bureau of Investigation ("TBI") laboratory in Memphis. DNA was recovered from the condom and, within eight hours, was matched to the petitioner. Police recovered the gun and mask used in the crimes, as well as latex gloves, condoms, and the property taken from the victims.

Following his arrest, the petitioner gave a video-recorded statement to Investigator Marty Plunk of the Weakley County Sheriff's Department, which was very brief and did not yield any significant information. The petitioner later gave a lengthy, full confession, during which his attorney was present.

The petitioner waived a preliminary hearing and entered guilty pleas in each of the three rape cases. Each case resulted in a sentence of twenty years. The trial court ordered that the sentences be served consecutively, resulting in a total effective sentence of sixty years, and that the petitioner serve 100 percent of the sixty-year sentence.

## POST-CONVICTION HEARING

On May 19, 2010, the petitioner filed a petition for post-conviction relief, arguing that he was denied the effective assistance of counsel and that his guilty pleas were not knowingly, voluntarily, and intelligently entered.

On January 10, 2011, the post-conviction court held an evidentiary hearing on the petition. Jim Phelps, the jail administrator and custodian of records for the Weakley County Sheriff's Department, testified that he took a booking photograph of the petitioner on September 9, 2009, when the petitioner was first booked into jail. He said that the photograph showed no signs of injury to the petitioner's head or face. Mr. Phelps testified that the petitioner was sent to the Middle Tennessee Mental Health Institute ("MTMHI") for a mental evaluation. When he returned on November 23, 2009, Mr. Phelps took another photograph of him, showing him with what appeared to be a black eye. Mr. Phelps said there was no record of any abuse of the petitioner while he was in custody and that he never filed a complaint about any abuse. Mr. Phelps said that he received a call from the petitioner's mother who told him that the petitioner had complained about being beaten in jail.

As to the alleged abuse of the petitioner by Correctional Officer David Ricketts, Mr. Phelps said that the jail records did not reflect that the petitioner filed any complaints about Officer Ricketts and he was unaware of any complaints filed by any inmate against Officer Ricketts alleging abuse.

Mr. Phelps testified that the jail personnel were aware of the petitioner's diabetes and blood pressure problems and that he was given medication for those conditions while in jail. The jail records of the meals given to the petitioner showed that he was occasionally, due to his diabetes, given meals that differed from those of the rest of the inmates. However, the records showed no meals in which he was given only plain lettuce to eat.

Mr. Phelps testified that the petitioner attempted to commit suicide by hanging himself with an electrical cord on September 20, 2009, before he was sent to MTMHI, and the petitioner timed this attempt to occur when he knew that numerous jail personnel would be available to assist him and prevent a successful suicide. There were occasions when the petitioner refused to eat or take his medication and said that he did not want to live.

The petitioner's mother, Marcia Tuck, testified that she had the petitioner execute a durable general power of attorney on September 25, 2009, after he had been arrested because he suffered from bipolar disorder and did not "seem to be in control." She said he seemed agitated, manic, and depressed, and, prior to his guilty plea, he seemed depressed at times and manic at others. She said that his eyes appeared to be dilated on at least one occasion, and she did not believe that he was receiving the correct medications in jail.

Ms. Tuck testified that, prior to the petitioner's guilty plea, he had complained to her many times about jail conditions, including being fed only plain lettuce, as well as threats of violence he had received. She said that he specifically accused Officer Ricketts of making the threats. Ms. Tuck acknowledged that she never observed any objective evidence of abuse, other than a bloody shirt. She said that she took a photograph of the petitioner after his return from MTMHI that showed a swollen right eye that was bruised and bloodshot. Ms. Tuck said that she took the petitioner to a mental health facility when he was fifteen years old for counseling because he was "really seriously depressed." The petitioner had once checked himself into a mental health facility after a fight with his wife.

Ms. Tuck testified that she discussed the petitioner's plea with him. He thought the offered sentence was excessive but was worried he would receive a higher sentence if he did not accept the offer. He felt that he had no other option and that trial counsel gave him this impression. He was not happy with trial counsel because, according to the petitioner, counsel did not come to the jail when the petitioner requested a visit or brief the petitioner about the status of the case.

Ms. Tuck testified that she personally spoke with trial counsel and told him about the petitioner's bipolar disorder. However, he told her that this diagnosis would not be useful as a defense. She said that trial counsel never discussed with her the possibility of suppressing the petitioner's confession or the fruits of the search.

Ms. Tuck testified that, during the plea hearing, she observed signs that the petitioner was under pressure due to duress and intimidation and seemed scared, but he did not seem incompetent or unaware of what he was doing. She never advised trial counsel that she believed the petitioner was incompetent or needed to be sent to a mental institution.

Trial counsel testified that he requested, and the trial court ordered, a psychological evaluation of the petitioner. He was not present for the first statement the petitioner made to the police but understood that it did not entail very much information. He was present for the second statement, which was very lengthy, and did not recall whether the petitioner was read his *Miranda* rights prior to making the statement.

Counsel testified that he met with the petitioner several times prior to the guilty pleas and discussed the range of punishments for the crimes with which the petitioner was charged; the evidence he expected the State to produce; and the possible motions that the defense could file, including motions to suppress the petitioner's first statement and the fruits of the search. He said that the petitioner insisted on moving the case along as quickly as possible in order to bring closure to the victims, "do the right thing," and avoid putting his parents through a trial.

Counsel further testified he discussed with the petitioner that, given the amount and strength of the evidence against him, it was unlikely that the petitioner would prevail at trial even if the defense won the motions to suppress. He said that the petitioner repeatedly attempted to speak to the police, despite counsel's continuous advice against doing so. Suppression of the petitioner's confession was "totally not an issue" because the petitioner was so eager to resolve the case quickly.

Counsel testified that he received a sixty-year offer from the State prior to the petitioner's giving his second statement, which he advised against because he feared that the offer would be retracted. However, the petitioner insisted on making the statement in order to move the case along. Counsel said that he discussed with the petitioner the effects of the guilty plea in waiving constitutional issues, which were included in writing on the plea form. Counsel said that he advised the petitioner that he would have to serve 100 percent of his sentence and register as a sex offender.

Counsel said he and the petitioner never discussed the possibility of withdrawing the plea, and the petitioner never contacted him about doing so. If the petitioner had asked him to file such a motion, he would have done so. However, counsel said that he was worried that, given the facts of the case, the trial court would sentence the petitioner consecutively on many convictions resulting in a longer sentence than the sixty years offered by the State.

Counsel said that, during the discovery process, the State gave him full access to the discovery file. He was aware that the State had DNA evidence; the property taken from the victims; a gun and clothing matching the descriptions given by the victims; and a box containing news clippings about the rapes, as well as "trophies" from the rapes, including items taken from the victims.

Counsel said that the petitioner specifically admitted the third rape to him and never seemed as if he did not understand what was happening throughout the process. Counsel never saw any indication that the petitioner was mentally unstable or had any mental health problems, but counsel asked the court to order a mental health evaluation as a precaution. The results of the petitioner's mental health evaluation showed he was competent to assist in his own defense, was not insane, and had no mental health defenses. Counsel did not recall the petitioner complaining to him about abuse in jail and did not observe any physical signs of abuse, other than the black eye the petitioner had when he returned from MTMHI.

Counsel testified that on the morning of the plea hearing, he spoke with the petitioner, who seemed perfectly coherent and requested to wear a suit. He explained the plea form to the petitioner, discussed the consequences of a guilty plea, the rights the petitioner would be waiving, and consecutive sentencing. The petitioner signed the guilty plea form.

Counsel testified that he never advised a client to either accept or refuse a plea agreement. He said that he advised the petitioner that he had decreased the likelihood of success at trial by confessing. Counsel said that he thought the petitioner was uncomfortable with the idea of entering an open plea and that he did not consider entering a conditional plea and reserving suppression issues for appeal.

Counsel testified that on November 26, 2009, the petitioner called the *Weakley County Press* from jail and explained to the news editor that he was pleading guilty to help bring closure to the victims and to avoid putting his family through the hardship of a trial. Counsel said that the petitioner told numerous people that he was being treated very well in jail.

The petitioner testified that he could not recall a time in his life when he felt that he was completely mentally stable. He said that he did not feel as if counseling had helped his mental condition but that due to his medication, he was more mentally stable than he had ever been. He said that he had been treated for numerous issues, including alcoholism and depression. He testified that he entered a mental health institution in 2008 after a fight with his wife and, while there, attempted to hang himself with a belt. He was committed for seven days, but the treatment did not work and he did not follow the recommended course of therapy after his release. He said he had attempted suicide several times prior to this incident.

-6-

The petitioner testified that he received numerous threats while incarcerated in the Weakley County Jail. Officer Ricketts attempted to convince him to speak with Officer Plunk, whom the petitioner said wanted him to plead guilty. He was subjected to numerous "gut checks" and was held in the "suicide tank" as punishment for not talking. He was told that his conditions would not improve until he spoke to Officer Plunk or an investigator and that his cell would get "smaller and smaller" until he gave his statement. He was fed a diet of plain lettuce and told that he would not receive anything else to eat until he gave a statement. After he talked to Officer Plunk, he was given a soft drink and potato chips and was then placed on a regular diet.

The petitioner said he gave two statements to the police and did not recall being read his *Miranda* rights before giving the first statement. He made his second statement prior to being sent to MTMHI. Officer Ricketts threatened him, saying he would be harmed if he did not cooperate and the abuse would be made to look like an accident or as if it was self-inflicted.

The petitioner said that, while at MTMHI, he was heavily sedated, restrained, and abused by two technicians. The injuries seen in his later booking photographs resulted from this abuse. He denied receiving a black eye in a fight with another inmate at the institution.

The petitioner said that when he returned to the Weakley County Jail from MTMHI, Officer Ricketts placed him in the "drunk tank" and informed him that he would spend the rest of his time in jail confined in that cell. In late November or early December 2009, Officer Ricketts came into his cell, with other officers, brandishing tasers and challenging the petitioner to hit him. He filed a complaint about this incident, as well as others, which were not documented by the jail staff. Officer Ricketts frequently administered "gut checks," punching him in the abdomen. On one such occasion, Officer Ricketts struck the petitioner in the face, causing his nose to bleed, and this was the origin of the blood on the shirt that Ms. Tuck testified about. Officer Ricketts often entered his cell and attempted to induce him to plead guilty. When Officer Ricketts was restraining him for transfer to the courtroom prior to the plea hearing, he again threatened the petitioner to induce him to plead guilty.

The petitioner testified that he met with trial counsel and co-counsel several times. They never discussed the facts and circumstances of each of the three cases with him, and the meetings never lasted longer than ten minutes. Counsel attributed the lack of time spent with the petitioner to being busy with other cases. Counsel did discuss the details of the third rape with him and advised him that the physical evidence from that particular crime was overwhelming.

The petitioner said that he and trial counsel never discussed filing motions to suppress the confession or the fruits of the search. He complained about the search but was told that the issue was moot because he had confessed to police. Trial counsel did not advise him that he had the option to plead guilty and have the judge sentence him at a separate sentencing hearing, which he would have preferred. He denied that his discussions of various options were limited because of his insistence on pleading guilty and said that it was trial counsel who advised him to waive the preliminary hearing for the benefit of the victims.

The petitioner testified that he was confused during the plea process because the agreement seemed to change as he talked to trial counsel. He was told that he must accept the sixty-year offer because it was the only offer he would get and that, if he did not accept it, the district attorney general would withdraw it. The petitioner said he was under the impression that he would eventually be eligible for parole and receive credit for good behavior and that both Officer Ricketts and trial counsel reassured him of this. The petitioner testified that he did not remember whether he understood the trial court's explanation of his sentences.

The petitioner said he pled guilty because he did not clearly understand all of the issues surrounding his pleas and because he feared for his life in jail. He was unaware that he could file a motion to withdraw his pleas. He never saw trial counsel again after entering his pleas. Although he did not contact trial counsel about withdrawing his pleas, he immediately began considering the possibility of doing so or filing a petition for post-conviction relief. He began working on his post-conviction petition when he arrived at the Shelby County Jail to face charges there.

The petitioner testified that he asked for a list of the medications he was taking while in jail but never received one, which he filed a complaint about, and that a nurse admitted to giving him the wrong medication at least once. He said that he felt "weird" on the morning of the plea hearing and that, in the days leading up to the hearing, he was on an "emotional roller coaster."

The petitioner testified that he called Sabrina Bates, news editor of the *Weakley County Press*, after Officer Ricketts had threatened him. He told Ms. Bates that he wanted to express his sincere, heartfelt feelings for the victims and that he was being treated very well by the jail staff and the district attorney general. He said two jail officers coached him to make these comments.

Ms. Bates testified that the petitioner called her on November 24, 2009, and told her that the jail staff had treated him well and handled his safety and security very professionally. He called her back two more times that day and, during the second call, asked her to send a

newspaper to his family. During the third call, they discussed the jail staff's professional treatment of him and his attempted suicide. The petitioner did not seem hesitant to speak to her, and she had no doubt that the petitioner made the calls of his own free will. He denied being mistreated in jail but said that he was beaten at MTMHI.

Mike Wilson, the Weakley County Sheriff, testified that there were telephones in the jail available to inmates for calls. It would not have been unusual for the petitioner to have access to a telephone to make a call to the newspaper.

Sheriff Wilson testified that Officer Ricketts resigned in lieu of termination for inappropriate contact with a female inmate; however, he had never heard any allegations of Officer Ricketts abusing the petitioner or other inmates. The petitioner was kept in a suicide watch cell for most of his incarceration in the Weakley County Jail.

Marty Plunk, an investigator with the Weakley County Sheriff's Department, testified that he attempted to interview the petitioner when he was arrested. The first interview was roughly thirty minutes or less in length and yielded very little information, with no confession or admission. Later, the petitioner sent him several messages asking to talk about the case. The petitioner gave a second statement, in which he confessed to the crimes. Counsel was present for the statement, and the petitioner spoke with him prior to the statement. Investigator Plunk did not read the petitioner his *Miranda* rights before the second statement because trial counsel was present. He denied that the petitioner was fed a certain diet to induce him to confess to the crimes. Investigator Plunk said that he did not think that Officer Ricketts was at the jail facility during the confession and that he was not in the interview room. He said that the petitioner appeared to enjoy telling his story.

Officer Sammy Lyles of the Martin Police Department recounted the facts of each of the crimes, how the petitioner became a suspect, and how the investigation proceeded. Officer Lyles testified that he interviewed the petitioner after the second statement to Investigator Plunk. He read the petitioner his *Miranda* rights on this occasion, and the petitioner waived those rights. Officer Lyles said that the interview was similar to the one by Investigator Plunk and that the petitioner again confessed.

The post-conviction court held that the petitioner's testimony was not credible, stating:

There is absolutely no evidence in the record to corroborate the petitioner's testimony other than the testimony of his mother, who obtained her information from the petitioner. In short, the Court does not believe the petitioner's testimony of abuse or of a diet of lettuce.

The post-conviction court found that the petitioner was capable of understanding his plea:

> [The petitioner] had undergone a psychiatric evaluation and was found to be competent. This opinion has not been refuted by other evidence. Furthermore, in observing the petitioner, both during his plea of guilty and during the post-conviction hearing, the Court finds no indication whatsoever to find that the petitioner was mentally incapable of understanding the plea or that he did not understand it.

Thus, the post-conviction court found that the petitioner's trial counsel was not ineffective in his representation of the petitioner.

## ANALYSIS

The post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. *See State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). During our review of the issues raised, we will afford those findings of fact the weight of a jury verdict, and this court is bound by the post-conviction court's findings unless the evidence in the record preponderates against those findings. *See Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *Alley v. State*, 958 S.W.2d 138, 147 (Tenn. Crim. App. 1997). This court may not reweigh or reevaluate the evidence, nor substitute its own inferences from those drawn by the post-conviction court. *See State v. Honeycutt*, 54 S.W.3d 762, 766 (Tenn. 2001). However, the post-conviction court's conclusions of law are reviewed under a purely de novo standard with no presumption of correctness. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

### I. Ineffective Assistance of Counsel

The petitioner argues that he received ineffective assistance of counsel because trial counsel: (1) failed to discuss the facts and circumstances of the petitioner's three cases with him; (2) failed to review audio and visual recordings of the petitioner's first statement to police; (3) failed to file a motion to suppress the petitioner's confession; and (4) failed to discuss with the petitioner the option of withdrawing his guilty pleas pursuant to Rule 32(f) of the Tennessee Rules of Criminal Procedure.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, the petitioner bears the burden of showing that (a) the services rendered by trial counsel were deficient, and (b) the deficient performance was prejudicial. *See Powers v. State*, 942 S.W.2d 551, 558 (Tenn. Crim. App. 1996). In order to demonstrate deficient performance, the petitioner must show that the services rendered or the advice given was

below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley*, 960 S.W.2d at 580.

As noted above, this court will afford the post-conviction court's factual findings a presumption of correctness, rendering them conclusive on appeal unless the record preponderates against the court's findings. *See id.* at 578. However, our supreme court has "determined that the issues of deficient performance by counsel and possible prejudice to the defense are mixed questions of law and fact . . .; thus, [appellate] review of [these issues] is de novo" with no presumption of correctness. *Burns*, 6 S.W.3d at 461.

Furthermore, on claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight. *See Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). This court may not second-guess a reasonably based trial strategy, and we cannot grant relief based on a sound, but unsuccessful, tactical decision made during the proceedings. *See id*. However, such deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. *See Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Once a guilty plea has been entered, effectiveness of counsel is relevant only to the extent that it affects the voluntariness of the plea. In this respect, such claims of ineffective assistance necessarily implicate the principle that guilty pleas be voluntarily and intelligently made. *See Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (citing *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)). As stated above, in order to successfully challenge the effectiveness of counsel, the petitioner must demonstrate that counsel's representation fell below the range of competence demanded of attorneys in criminal cases. *See Baxter*, 523 S.W.2d at 936. Under *Strickland v. Washington*, 466 U.S. 668, 694 (1984), the petitioner must establish: (1) deficient representation and (2) prejudice resulting from the deficiency. However, in the context of a guilty plea, to satisfy the second prong of *Strickland*, the petitioner must show that "there is a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59; *see also Walton v. State*, 966 S.W.2d 54, 55 (Tenn. Crim. App. 1997).

Trial counsel testified that he did not review the video recording of the petitioner's first statement to police; however, he stated that he may have reviewed a transcript of the statement. He stated that, to his knowledge, this statement was largely inconsequential. Testimony from other witnesses at the post-conviction hearing supported this conclusion. Trial counsel further testified that he met with the petitioner several times and thoroughly

discussed the case prior to the petitioner's entry of the pleas. Trial counsel stated that the petitioner directed him not to file a motion to suppress the confession because he wanted to bring the case to an end and "do the right thing." Moreover, trial counsel stated that he specifically advised the petitioner not to give his confession to the police and that when the petitioner decided against counsel's advice, counsel was present with the petitioner during the confession. As for the petitioner's claim that trial counsel was ineffective for failing to move to allow the petitioner to withdraw his plea pursuant to Rule 32(f) of the Tennessee Rules of Criminal Procedure, trial counsel testified that although he saw no basis for such a motion, he would have filed a motion to withdraw the plea if the petitioner had asked him to do so.

The petitioner has failed to prove by clear and convincing evidence that trial counsel was ineffective in this case. Therefore, the petitioner cannot satisfy the first prong set out in *Strickland*. We conclude that the evidence does not preponderate against the post-conviction court's finding that the petitioner was afforded effective assistance of counsel.

Therefore, this issue is without merit.

## II. Involuntary Guilty Pleas

The petitioner next contends that his pleas were not entered knowingly and voluntarily because, at the time of the pleas, he: (1) had "mental issues" and was in a manic state; and (2) was subject to threats while incarcerated aimed at inducing his guilty pleas.

When evaluating the knowing and voluntary nature of a guilty plea, the United States Supreme Court has held that "[t]he standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *Alford*, 400 U.S. at 31. The court reviewing the voluntariness of a guilty plea must look to the totality of the circumstances. *See State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995); *see also Chamberlain v. State*, 815 S.W.2d 534, 542 (Tenn. Crim. App. 1990). Specifically, a reviewing court must consider "the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial." *Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993).

The plea colloquy is included in the appellate record. The colloquy demonstrates that the trial court advised the petitioner of his rights. The petitioner told the trial court that he

understood his rights and had been advised of the effects of entering a guilty plea. Furthermore, the petitioner provided no evidence, outside of his own testimony and that of his mother, as to a medical diagnosis regarding his mental capacity. The petitioner did not present a medical expert to testify as to his alleged lack of mental capacity at the time of the plea. As for his argument that he was coerced to enter guilty pleas, the only evidence presented in support of this assertion was the petitioner's own testimony. The trial court specifically found that the petitioner's testimony as it related to this issue was not credible and that there was no coercion. Because the evidence in the record does not preponderate against the findings of the trial court, the petitioner is not entitled to relief on this issue.

## **CONCLUSION**

Based upon the foregoing authorities and reasoning, we affirm the judgment of the post-conviction court.


_____
ALAN E. GLENN, JUDGE